Argued and submitted January 23, reversed June 15, 1981

MAIN,
*Respondent,*
*v.*
HOWARD,
*Appellant.*

(No. A7903 01084, CA 17640)

629 P2d 870

William F. Thomas, Portland, argued the cause and filed the brief for appellant.

No appearance for respondent.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

WARDEN, J.

## WARDEN, J.

This is a suit for reformation of a stock certificate. The trial court ordered that the certificate, which was issued in the names of plaintiff and defendant as joint tenants, be reformed by removing defendant's name and that a new certificate be issued in plaintiff's name alone. We reverse.

Plaintiff was 67 years of age, in August, 1977, when the stock certificate was issued to her and defendant as joint tenants. She had been divorced from her first husband in 1975, and had married Mr. Main shortly thereafter. Plaintiff and her second husband were divorced after the filing but before the trial of this case, and she has since resumed the use of her former married name, Cora L. Liedke.

The 330 shares of PGE common stock which are the subject of this suit were given to plaintiff by her first husband over a span of approximately 30 years. Early certificates were issued originally in her name alone, but were later reissued to her and her husband jointly. Later, new stock certificates were issued in joint form. Plaintiff testified that she recalled that both she and her husband were required to endorse the dividend checks. Plaintiff was awarded the stock by the decree of divorce from Mr. Liedke, and a new certificate for 330 shares was issued in the name of Cora L. Main, her new married name.

Plaintiff and defendant were neighbors. They had been acquainted for approximately two years when, in the summer of 1977, they became close friends. Defendant frequently called and visited plaintiff. Plaintiff apparently held both defendant and defendant's husband in high regard. She executed a will on August 5, 1977, leaving nothing to her husband, leaving her only child, a daughter, an account at Equitable Savings and Loan, and naming defendant and defendant's husband, John N. Howard, as residuary legatees. The will named John N. Howard as personal representative. At about the same time, plaintiff invited defendant to accompany her on a vacation trip to Hawaii in October, 1977, without cost to defendant.

In mid-August, 1977, after the execution of the will, plaintiff and defendant had a conversation concerning

the 330 shares of PGE stock. The testimony as to the substance of this conversation is conflicting, with plaintiff testifying as follows:

> "I said, 'Lolet, I'd like for you to have the P.G.E. stock at my death, if I still had it.' But I says, 'I may have to sell that.' I says, 'I never know. I may have to end up in a nursing home.' And she thoroughly understood it. And she said, 'Yes, I know. I know.'

> "That's all I ever got out of her. 'I know. I know.' And I repeated it again that I may have to end up selling it. But if I have it at my death, I'd like for her to have it."

Defendant testified concerning the same conversation as follows:

> "One day when I went over to Mrs. Main's house, she told me that she owned some Portland General Electric stock and she would like to give it to me so that I could keep it as security so if something happened to my husband. And she said that she would have to have the dividends from the Portland General Electric stock to live on each quarter or whenever it was issued. And I told her that was fine with me. She said that she wanted me to keep it and just not cash it in but to just keep it as security so if something happened to my husband that it would be enough money that I could pay off my home with. And I told her I would. And she told me that we would have to go to the First National Bank and in addition to have my name put on the stock. And she had already talked to the First National Bank and they had—they had informed her that we would have to come together to sign the papers to have my name in the stock. And that was it."

On August 18, 1977, soon after this conversation, defendant took plaintiff to the Portland branch of the First National Bank of Oregon, located at 121st and Division, and plaintiff arranged for reissuance of the stock certificate. (The bank was acting in lieu of a broker.) Again there is conflict in the testimony as to the instructions given to the personnel at the bank, with plaintiff testifying as follows:

> "We both went in and she picked me up from her work. It could have been the next day. It was within a few days, though, I'm sure. And she took me down there and we both signed it. She never said one word at the window. And I told them to—distinctly how I wanted it made out with 'or.' 'Cora L. Main or Lolet Howard.'"

Defendant, on the other hand, testified that plaintiff definitely told bank officials that she wanted to have the stock reissued to Cora L. Main *and* Lolet Howard.

A stock assignment was prepared by the bank and signed by plaintiff. It reads that plaintiff, Cora L. Liedke, "sells, assigns and transfers unto Cora L. Main & Lolet Howard Jt Ten (330) Shares of the Capital Stock of the Portland General Electric Company * * * ." Plaintiff's signature was guaranteed by First National Bank. Plaintiff requested that the dividends be sent to her alone. The letter requesting transfer, which was prepared by First National Bank, directed that the stock be transferred to plaintiff and defendant as joint tenants, and the transmittal letter requested that forms be sent to enable the dividend checks to be payable to Cora L. Main *or* Lolet Howard.

The officer at First National Bank who signed these documents testified that the documents were prepared by a teller at the "Notes" window, after consulting a policy manual, and that they were brought to an authorized signer and another officer for signature and approval. The officer also testified that plaintiff requested an assignment or a name change to "Cora L. Main and Lolet Howard, joint tenants," but the testimony is unclear as to whether this officer spoke to plaintiff personally. The officer testified that the transaction was "documented" by another officer, who was no longer with the bank at the time of trial. A bank employee signed the guarantee of plaintiff's signature on the stock assignment. The stock certificate, stock assignment, letter requesting transfer and transmittal letter were sent to U.S. National Bank, the transfer agent for the stock.

U.S. National Bank issued a new stock certificate to Cora L. Main *and* Lolet Howard as joint tenants, per the instructions transmitted by First National. The employee representing U.S. National Bank as transfer agent testified that, for policy reasons, the certificate could not have been issued to Cora L. Main *or* Lolet Howard. Only the instructions to U.S. National regarding dividends provided that they should be paid to Cora L. Main *or* Lolet Howard. The dividend order form prepared by U.S. National showed the stock as registered in the names of "CORA L MAIN &

LOLET HOWARD JT TEN," but that the dividend checks should be issued to Cora L. Main at her address. This was returned to the First National Bank, where it was signed by both plaintiff and defendant on September 1, 1977. The signatures were guaranteed by First National.

Plaintiff testified that, although she signed the stock assignment and the dividend order form, she failed to read either before signing or, if she did read them, she did not understand that there was much difference between "and" and "or" in terms of the control over the stock. However, she reiterated that she had specifically instructed the First National Bank to make the stock out to read Cora L. Main *or* Lolet Howard. Plaintiff further testified that when the reissued stock certificate came back about a week later, she either did not look at it or if she did, she did not pay attention to it. She contacted defendant's husband, and together they placed the certificate in a safe-deposit box rented in both their names, Cora L. Main and John N. Howard.

Plaintiff and defendant took their planned vacation to Hawaii in October, 1977. Their relationship began to deteriorate while on the trip, and they ceased to communicate with each other shortly after their return.

In January, 1979, plaintiff decided to sell the PGE stock and learned that defendant's signature would be required. It was plaintiff's testimony that this was the first time she became aware that the certificate was not issued to Cora L. Main *or* Lolet Howard. The testimony is again in conflict as to what transpired between the parties at this time. Plaintiff testified that she called several times requesting that defendant sign off on the stock so that plaintiff would "have possession of it," and that she had no intention of taking defendant's name off the stock, but merely wanted to be able to sell it to "bring her income up a little bit." Defendant, on the other hand, testified that the only conversation she had with plaintiff regarding the stock was a telephone call in January, 1979, wherein plaintiff told her that First National Bank would sue her if she refused to sign papers taking her name off the stock.

When defendant failed to relinquish her interest in the stock, plaintiff contacted an attorney, who sent defendant a letter demanding that she do so. Defendant did not

respond, and plaintiff instituted this suit for reformation, claiming that there had been a mutual mistake of law. Plaintiff's complaint alleged that both parties agreed that plaintiff would make a testamentary gift of the 330 shares of PGE stock to defendant, reserving in plaintiff the right to revoke the gift at any time, that they both intended that the stock certificate be reissued in the names of "CORA L. MAIN or LOLET HOWARD or the survivor thereof," that they were unaware that the stock could not be issued in that manner, and that plaintiff intended to maintain control of the stock and receive the dividends while defendant would receive the stock upon plaintiff's death, if the stock were still owned by plaintiff at that time.

Defendant's answer affirmatively alleges that plaintiff told defendant that she was making a gift to defendant of a joint interest in the stock, with ownership of the stock to vest solely in defendant at the time of plaintiff's death.

The trial court found that plaintiff had established the material allegations of her complaint and that defendant had not established the material allegations of her affirmative defense. The court declared that plaintiff was the sole owner of the 330 shares of PGE common stock and authorized and directed the transfer agent to reissue the stock in the name of plaintiff only. Plaintiff was also awarded judgment for costs and disbursements in the suit.

Defendant appeals from this order, contending that the court erred in allowing reformation based upon mutual mistake, because the evidence of that mistake was not clear and convincing. Although plaintiff has not filed a brief with this court, we will consider the case on its merits, as is mandated by Oregon Rules of Appellate Procedure, Rule 7.32.

■ The law entertains a presumption favoring the validity and correctness of written instruments, and to obtain reformation on the grounds of mutual mistake evidence of a mistake shared by both parties must be clear, convincing and unambiguous, *Koennecke v. Waxwing Cedar Products, Ltd.,* 273 Or 639, 643, 543 P2d 669 (1975), as must the evidence of the terms of the prior agreement to which the subsequent instrument can be made to conform. *Frick v. Hoag,* 277 Or 135, 138, 559 P2d 879 (1977).

Although this is a suit in equity and is tried *de novo* in this court, ORS 19.125, the findings of the trial court are entitled to great weight, *Cole v. Fogel et al,* 210 Or 257, 310 P2d 315 (1957), especially where only interested witnesses testify and the testimony is conflicting. *Adamson v. Adamson,* 273 Or 382, 541 P2d 460 (1975). In this case, however, we are not relying solely on the conflicting testimony of two interested witnesses. Other evidence in the record contradicts plaintiff's contention that the parties agreed that the stock was to be a testamentary gift to the defendant and that both parties mistakenly believed that this would be the legal effect of the transaction at First National Bank which resulted in the reissuance of the stock certificate to "CORA L MAIN & LOLET HOWARD JT TEN."

At the time the parties had their conversation in which the gift of the stock was first discussed, plaintiff had already executed her will naming defendant as residual colegatee. If the parties intended that plaintiff would retain sole control of the stock and that defendant would receive the stock only upon plaintiff's death, there would have been no need to add defendant's name to the certificate, because she would have taken the stock under the will.

■ There are two documents, in addition to the stock certificate itself, which show that the stock was to be reissued to the parties as joint tenants. They are the stock assignment and the dividend order form. Both were signed by plaintiff, and her signature was guaranteed by a bank officer. Although there is conflicting testimony as to whether she read these documents before signing them, it seems unlikely that she would have neglected to read either of them, as well as the stock certificate, which she had in her possession for a time before placing it in the safe-deposit box. Although the fact that a person fails to read an instrument before accepting or signing it is not of itself a barrier to a suit for reformation, *Wolfgang v. Henry Thiele Catering Co.,* 128 Or 433, 445, 275 P 33 (1929), her professed failure to read *three* separate documents before signing or accepting them weighs against her in evaluating the evidence. Her testimony that she would not have considered the distinction between "and" and "or" on the documents to be of much significance, if she had read them,

is squarely contradicted by her testimony that she insisted that First National Bank have the certificate reissued in "or" form and that she asked that the dividends be made payable disjunctively.

Plaintiff also had reason to know that joint ownership required the signatures of both parties. She testified that both she and her first husband had had to endorse the dividend checks when the stock was held in both their names. When the stock was held by plaintiff and defendant, defendant's signature was required before the dividends would be sent to plaintiff alone.

The testimony of the First National Bank officer who signed the transfer order and the transmittal letter indicates that the bank was instructed to issue the stock in joint tenancy. Another officer approved the transaction and guaranteed plaintiff's signature both at the time of the original visit and later when the dividend order was signed; it is likely that, if plaintiff had requested that the names of the parties appear on the stock certificate in the disjunctive, the officer would have explained to her the feasibility and effect of so doing.

The fact that plaintiff deposited the stock certificate in the safe-deposit box also weighs against her contentions. Defendant's husband had access to the safe-deposit box. Conceivably, defendant, through her husband, could have come into possession of the certificate. If defendant did come into possession, she might be able to negotiate the certificate, to plaintiff's disadvantage, if it was in the form plaintiff now claims was intended. It is very doubtful that plaintiff would intentionally put herself in a position from which she could lose all control of the stock.

Plaintiff, at trial, relied upon a line of cases holding that in the case of joint bank accounts, the deposit agreement signed by a donor depositor is not conclusive evidence of the parties' intent, that a joint and several bank account is not typically intended to be for the benefit of a donee signatory until the donor's death and that, absent evidence to the contrary, the donee is but a trustee of the account for the benefit of the donor during the donor's lifetime. *Greenwood v. Beeson,* 253 Or 318, 454 P2d 633 (1969). This rationale was held to include certificates of deposit in *Johnson v. Steen,* 281 Or 361, 575 P2d 141 (1978).

These decisions are inapposite to the case before us. The court in *Greenwood* was cutting a "new path in this field of the law," because traditional property concepts of joint tenancy did not fit joint bank accounts, and "rules should be provided which are more consistent with the intention of those who use the joint bank account device." 253 Or at 321, 322, n 3.[1] A deposit agreement may be likened to an "adhesion contract" and is prepared by the bank primarily to protect its own interests rather than to define the rights of the co-depositors *inter se.* 253 Or at 323. The documents signed by plaintiff in this case were prepared solely for her own purposes; the bank officer testified that the bank acted in lieu of a broker for the convenience of its customers and, in fact, discarded all copies of the documents after the completed certificate was accepted by plaintiff.

The totality of the evidence does not support plaintiff's contentions that the parties both intended that defendant would have no interest in the stock until after plaintiff's death, if she still owned it, or that both parties were mistaken as to the legal effect of the reissuance of the stock certificate in the name of "CORA L MAIN & LOLET HOWARD JT TEN." Although we defer to the trial court's assessment of the credibility of the testimony of the two interested witnesses, the record fails to reveal the clear, convincing and unambiguous evidence of mutual mistake required to warrant reformation of a presumptively correct written instrument.

Reversed.

---

[1] The legislature, in 1977, statutorily defined the nature of ownership of multiple-party bank accounts, in ORS 708.611, which provides as follows:

"A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent."