Argued and submitted November 1, 2001, reversed and remanded on appeal; affirmed on cross-appeal January 30, 2002

## Allan D. MURRAY
and Florence K. Murray,
husband and wife,
and Murray Development Partners,
a Limited Partnership,
*Respondents - Cross-Appellants,*

*v.*

## Lavern T. LAUGSAND
and Norma Fran Laugsand,
husband and wife,
and Trustees of the Laugsand Family Trust,
*Appellants - Cross-Respondents.*

98-CV-00132; A107950

39 P3d 241

David V. Gilstrap argued the cause for appellant - cross-respondent LaVern T. Laugsand. With him on the briefs was Davis, Gilstrap, Hearn, Saladoff & Smith, P.C.

Michael J. Bird argued the cause for appellant - cross-respondent Norma Fran Laugsand. With him on the opening brief were Frank C. Rote and Brown, Hughes, Bird & Rote. On the reply brief were Frank C. Rote and Brown, Hughes, Bird, Rote & Wetmore.

David V. Gilstrap and Davis, Gilstrap, Harn, Saladoff & Smith and Frank C. Rote and Brown, Hughes, Bird, Rote & Wetmore filed a joint supplemental brief for appellants - cross-respondents.

Walter L. Cauble argued the cause for respondents - cross-appellants. With him on the brief was Schultz, Salisbury, Cauble & Dole.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

BREWER, J.

## BREWER, J.

Defendants appeal from a judgment granting plaintiffs' claim for reformation of a deed. Most prominently, defendants assign error to the trial court's conclusion that plaintiffs' negligence in failing to detect an unacceptable provision in the deed before closing the parties' transaction was insufficient to preclude reformation based on plaintiffs' unilateral mistake. Defendants also assign error to the trial court's award of attorney fees to plaintiffs. Plaintiffs cross-appeal, assigning error to the trial court's dismissal of their claim for specific performance of a settlement agreement between the parties and to the court's award of attorney fees to defendants on that claim. On *de novo* review, *Jensen v. Miller*, 280 Or 225, 227, 570 P2d 375 (1977), we reverse and remand on defendants' appeal and affirm on plaintiffs' cross-appeal.

 Plaintiffs were required to prove their claims for specific performance and reformation by clear and convincing evidence. *Marastoni v. Lucey*, 268 Or 433, 440, 521 P2d 521 (1974) (applying standard to specific performance claim); *Foster v. Gibbons*, 177 Or App 45, 53 n 7, 33 P3d 329 (2001) (applying standard to reformation claim). Although we are not bound on *de novo* review by the trial court's findings of fact, where conflicting testimony "is taken by a trial judge, who has the opportunity to observe the demeanor of the witnesses, the trial court's findings are entitled to great weight." *Jensen*, 280 Or at 227.

The following facts were established by clear and convincing evidence in the record. In 1992, plaintiffs Allan Murray and Florence Murray were debtors in a Chapter 11 bankruptcy proceeding in federal court. Defendant LaVern Laugsand was plaintiffs' creditor. Defendant Norma Laugsand is LaVern's wife. Allan Murray and LaVern Laugsand were the co-owners of a 640-acre parcel of land known as the "Root Springs" property. Murray owned a 25 percent interest in the surface property rights and Laugsand owned the remaining 75 percent interest in the surface

rights. Each owned 50 percent of the mineral rights. In October 1992, plaintiffs and Laugsand entered into a written settlement agreement (the agreement) to resolve all of Laugsand's claims against plaintiffs. The agreement recited that the parties "acknowledge[ ] that, absent this settlement agreement, judicial resolution by extended litigation would be expensive for each party." Paragraph 2 of the agreement required Murray to convey to Laugsand "all of his interest in and to the [Root Springs] property, including all timber." In turn, paragraph 3 required Laugsand to deed all of the mineral rights on the Root Springs property to Murray. Paragraph 3 also provided that the mineral rights conveyance "shall include the timber rights for a [20-acre] circular area, the center of which is the center of the existing quarry." That conveyance was to be "in the form of a bargain and sale deed, substantially identical to that set forth in Exhibit E" attached to the agreement.

Consistent with the agreement, the Exhibit E deed form granted to plaintiffs "timber rights for a [20-acre] circular area, the center of which is the center of the existing quarry, on the following described real property, situated in Josephine County, Oregon * * * [describing property]." The agreement was signed by Murray and Laugsand on October 28, 1992, and by Florence Murray on October 29.[1] However, by its terms, the agreement was not binding upon the parties until approved by the bankruptcy court. Accordingly, the mineral rights deed was not executed and was not delivered to Murray at that time.

On December 15, defendants' attorney wrote plaintiffs' attorney in an attempt to clarify the terms of the mineral rights conveyance.[2] Defendants' attorney was concerned

---

[1] Norma Laugsand was not a party to, and did not sign, the agreement. However, she was a co-grantor under the mineral rights deed to Murray.

[2] Throughout this opinion we refer to the actions of the parties and their attorneys in 1992 and 1993. The attorneys to whom we refer were the parties' attorneys at that time. All parties are represented by different attorneys in the present litigation. Because both plaintiffs were represented by the same attorney in the underlying transaction, we refer to that attorney as "plaintiffs' attorney." Although, as noted below, Norma Laugsand contends on appeal that she was not represented by LaVern Laugsand's attorney in the underlying transaction, for ease of reference we nevertheless refer to that attorney as "defendants' attorney."

that the deed provision granting timber rights to plaintiffs within the 20-acre area was "potentially ambiguous" and might not reflect the actual intent of the parties. He explained his concern in a letter to plaintiffs' attorney:

> "[Murray] is provided with all timber rights necessary to explore, develop, quarry, use mining shafts, reasonable use and occupation of the surface, including the cutting of any trees reasonably necessary for such purposes within a 20 acre circular area, the center of which is the center of the existing quarry.
>
> "In other words, the parties do not intend to give marketable timber rights to [Murray] on that 20 acre parcel. The parties intend solely to give [Murray] or his successors the right to cut whatever trees that may need to be cut for mining purposes, including exploration, development, etc."

Defendants' attorney concluded the letter by stating:

> "I am therefore inserting after the words 'existing quarry,' the following language in the deed:
>
> > " '. . . as reasonably necessary for the exploration, development, quarrying, mining or other related incidental occupation of the surface of the land for mining or quarrying purposes.' "

Plaintiffs' attorney did not share the view that the deed was ambiguous. He testified:

> "Well, I recall having a conversation with [defendants' attorney] in which I said essentially, No way, we're not going along with the change in the language. And I recall [him] saying something like that he wasn't sure [Laugsand] would sign the agreement or sign the deed if it didn't have that language in it. And I said something like, Well, that's just tough, that's what the deal is and we're not changing it."

Defendants' attorney testified that neither plaintiffs nor their attorney ever objected to the change. The trial court found as fact, however, that "[p]laintiffs' attorney * * * did not agree to this change and communicated his position to [d]efendants' attorney * * * by telephone." Plaintiffs' attorney also testified that he conferred with his client regarding the proposed change:

"I think [Murray] and I talked about it in the context of, You won't believe what these guys are trying to pull now. And [Murray] and I had talked several times after the negotiations and felt like we had gotten a good deal. We both sort of said, you know, that we'd come out of the negotiations with a good result, and in large part because we'd gotten the timber rights, plus we'd gotten basically everything else we wanted except the water rights. And so I know Murray and I had a conversation after [the agreement] was all done where we said, Good job, we really got a good deal out of this. And I believe we had a conversation after I got this letter. I don't think it was specifically about this letter, but I think we had a conversation the meaning of which was, You won't believe what these guys are trying to pull now."

Plaintiffs' attorney did not confirm in writing his objection to the change—either to his clients or to defendants' attorney. Despite the objection to the change, defendants' attorney did not remove the revision from the deed. The trial court found that "[defendants' attorney] did not further communicate with [plaintiffs' attorney] in regard to the change," and "[defendants' attorney] did not furnish a copy of the changed deed to [plaintiffs' attorney]."

The bankruptcy court approved the agreement in January 1993, although the court did not receive a copy of the revised deed. Defendants nonetheless executed the revised deed and, at the closing of the agreement in March, submitted it to the title company for recording. Murray was present at the closing, received a copy of the deed along with other closing documents, and signed the necessary closing documents. At no time during the closing process did Murray object to the revision in the deed. He also received a copy of the deed after it was recorded but did not read it either at the closing or after receiving a copy of it. Shortly after the deed was recorded, Murray conveyed the mineral interests he had just received to a business entity under his control—using the identical language pertaining to timber rights that was used in the recorded deed. Murray testified that he also signed that deed without reading it.

The parties had few dealings with each other and no occasion to dispute the ownership of the timber rights on the 20-acre parcel during the next five years. In 1998, plaintiffs

sought Laugsand's endorsement of a zone change application designed to facilitate plaintiffs' mining operations. When Laugsand refused, plaintiffs filed this action for specific performance of the agreement and for timber trespass. In their specific performance claim, plaintiffs alleged that Laugsand had breached the agreement by failing to assist in obtaining the necessary governmental approvals to allow plaintiffs to exercise their extraction rights under the mineral deed. Plaintiffs sought to compel defendants to join in the zone change application. In the timber trespass claim, plaintiffs alleged that defendants had unlawfully removed trees from the 20-acre parcel without plaintiffs' permission. Plaintiffs sought damages for the lost timber.

Defendants' answer alleged, among other defenses, that plaintiffs' only timber rights on the 20-acre parcel were incidental to their mineral rights; therefore, any marketable timber that defendants harvested rightfully belonged to defendants. At trial, plaintiffs testified that defendants' answer first alerted them to the revision in the deed. At that point, plaintiffs amended their complaint to seek reformation of the deed, based on a theory of unilateral mistake, to delete the revision. Plaintiffs also added claims for a mandatory injunction compelling defendants to sign the zoning application and, as alternatives to the specific performance and mandatory injunction claims, a breach of contract claim seeking damages. Defendants counterclaimed for declarations that they were not required to cooperate with plaintiffs' attempts to rezone and join in the zone change application and that the deed in question did not convey marketable title to all timber within the 20-acre parcel. In their respective pleadings, plaintiffs and defendants sought attorney fees pursuant to the attorney fee provision of the agreement.

After a bench trial on the equitable claims,[3] the court reformed the deed to conform to the form attached as Exhibit E to the agreement on the ground that "[t]he change in the deed was a unilateral mistake." The court dismissed with

---

[3] The trial court entered an order bifurcating the action. The order directed that the case first proceed to trial on the equitable claims (specific performance, mandatory injunction, and reformation), with the legal claims (breach of contract and timber trespass) reserved for later disposition.

prejudice plaintiffs' claims for specific performance and mandatory injunction. In a supplemental judgment, the court awarded plaintiffs attorney fees on the reformation claim. On the specific performance and mandatory injunction claims and corresponding counterclaim, the court awarded Laugsand a judgment for attorney fees, and it awarded Norma Laugsand a further and separate judgment for attorney fees. The court held the remaining legal claims and defenses in abeyance pending the outcome of the appeals on the equitable claims.

On appeal, defendants argue that the trial court erred in granting reformation on the ground of unilateral mistake. Defendants assert that the parties' written agreement was internally inconsistent and thus ambiguous, so that it required the clarification proposed by defendants' attorney. Defendants also contend that the trial court erroneously determined that they had engaged in inequitable conduct on the strength of two findings of fact that were not supported by the evidence. Finally, defendants contend that plaintiffs failed to satisfy their burden to prove that the mistake did not arise from their own gross negligence. On cross-appeal, plaintiffs assert that the trial court erred in dismissing their specific performance and injunction claims and that the separate awards of attorney fees to each defendant were excessive and duplicative.[4] Because plaintiffs' arguments on cross-appeal do not require extended discussion, we affirm on cross-appeal without further discussion.

We turn to defendants' appeal from the portion of the judgment reforming the deed. A party seeking to reform a written instrument must establish

"(1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the

---

[4] Plaintiffs do not renew on cross-appeal their argument that defendant Norma Laugsand is not entitled to attorney fees because she was not a party to the agreement. *Cf. AutoLend, IAP, Inc. v. Auto Depot, Inc.*, 170 Or App 135, 139, 11 P3d 693 (2000), *rev den* 332 Or 240 (2001) (holding that the defendant was not entitled to attorney fees under ORS 20.096 or the disputed contract because the defendant successfully proved that it was not a party to the contract).

other party; and (3) that the party seeking reformation was not guilty of gross negligence." *Jensen*, 280 Or at 228-29.

"There is a strong presumption that a deed expresses what the parties had in mind, and the burden of overcoming the presumption rests on the party seeking reformation[.]" *Shoulderblade v. Osborn*, 60 Or App 12, 16, 652 P2d 836 (1982); *see also Main v. Howard*, 52 Or App 797, 806, 629 P2d 870 (1981) (written stock certificate is considered "presumptively correct"). The party seeking reformation must prove the necessary elements by clear and convincing evidence. *Foster*, 177 Or App at 53 & n 7. "A mere preponderance of the evidence will not suffice." *Shoulderblade*, 60 Or App at 16; *see also Kontz v. B. P. John Furniture Corp.*, 167 Or 187, 205, 115 P2d 319 (1941).

We first consider defendants' argument that the agreement and Exhibit E were ambiguous and thus required the clarification that defendants' attorney sought to give them.[5] Unless directed otherwise by an instrument, we give terms their common or ordinary meaning. *Morasch Meats v. Western Boxed Meats Distributors*, 157 Or App 253, 260, 971 P2d 426 (1998), *rev den* 328 Or 594 (1999). Both the agreement and the Exhibit E deed form without restriction "include[d] the timber rights for a [20-acre] circular area, the center of which is the center of the existing quarry." The term "timber rights" is not defined in the deed or the agreement. A "right" is broadly defined as "a claim or title to property or possession * * * ‹bought land and water ~s * * *›." *Webster's Third New Int'l Dictionary*, 1955 (unabridged ed 1993). Giving the term its unrestricted common meaning, we conclude that the agreement entitled plaintiffs to *all* timber rights for the designated tract without any other limitations. *See Criterion Interests, Inc. v. The Deschutes Club*, 136 Or App 239, 245-46, 902 P2d 110, *on recons* 137 Or App 312, 903 P2d 421 (1995), *rev den* 322 Or 489 (1996) (declining to impose limitation on purposes of access easement where scope was "unambiguously left unrestricted").

---

[5] At oral argument, defendants also asserted that there was no "meeting of the minds" as to the nature and extent of plaintiffs' timber rights on the 20-acre parcel and, therefore, that there was no enforceable antecedent agreement. However, defendants concede that their "meeting of the minds" argument was not preserved; therefore, we do not consider it further.

Defendants protest that the agreement was internally inconsistent. They note that paragraph 2 required Murray to convey to Laugsand all of his interest in "all timber" on the Root Springs property. In defendants' view, that grant is inconsistent with the requirement of paragraph 3 that Laugsand convey to Murray "the timber rights" for the 20-acre parcel. We disagree. As noted, Murray and Laugsand were co-owners of the Root Springs property before the agreement was closed. The agreement was intended to voluntarily disentangle their interests in lieu of extended and costly litigation. There is nothing inherently inconsistent between Murray's agreement to convey to Laugsand his interest in the tract *as a whole* and Laugsand's return agreement to convey to Murray mineral and timber rights covering a *specific portion* of the tract. The agreement and the attached form of deed constitute unambiguous evidence of an antecedent agreement to which the recorded deed could be reformed.

As to the second requirement for reformation, defendants argue that they were not guilty of inequitable conduct and that, regardless, in order to reform the deed, their conduct must not merely have been inequitable, but must have been more egregious, namely, unconscionable.[6] We consider those arguments in reverse order.

Defendants rely on *Walcutt v. Inform Graphics, Inc.*, 109 Or App 148, 817 P2d 1353 (1991), *rev den* 312 Or 589 (1992), for the proposition that, to reform a settlement agreement, their conduct must be more than simply inequitable, it also must be unconscionable. In *Walcutt*, the plaintiff, the personal representative of an estate, sought to reform a general waiver and release agreement in order to specifically exclude a debt owed by the defendants on a promissory note in the decedent's favor. The plaintiff was unaware of the note when she executed the general release. We concluded that

_____

[6] For the first time on appeal, Norma Laugsand argues that, because she was not represented by her husband's attorney, even if he engaged in inequitable or unconscionable conduct, such conduct cannot be imputed to her via agency. Thus, she reasons, there was no ground to reform the deed against her. She also argues that plaintiffs may not obtain reformation as to LaVern Laugsand, because "[i]t would be impossible to change LaVern T. Laugsand's interest without changing Norma Laugsand's interest as they jointly own an undivided share of the interest in issue." Because this argument is not preserved, we do not consider it on appeal. ORAP 5.45(4).

"[t]he rule is that 'an honest release, untainted by unconscionable conduct, can[not] be set aside because it was improvident.' Releases and settlements are not rendered unenforceable either by 'ordinary mistakes' or negligent ones in the parties' knowledge and understandings when they enter into them and they 'are favored by the law.'" *Id.* at 151 (citations omitted; brackets in original).

It is true that in *Walcutt* and several other decisions involving reformation and the cancellation of instruments, we have held that unconscionable conduct is necessary; however, none of those cases distinguishes between conduct that is unconscionable and conduct that is inequitable. *See, e.g., Rugemer v. Rhea,* 153 Or App 400, 405, 957 P2d 184 (1998) ("Without a showing that the [settlement] agreement was obtained by misrepresentation or unconscionable conduct, an improvident agreement may not be voided."); *Raymond v. Feldmann,* 120 Or App 452, 455, 853 P2d 297, *on recons* 124 Or App 543, 863 P2d 1269 (1993), *rev den* 318 Or 381 (1994) (release agreement "may be voided if the agreement has been obtained by misrepresentation or unconscionable conduct"). Indeed, in other contexts, the Supreme Court has used the terms inequitable and unconscionable interchangeably. *See, e.g., Southworth v. Oliver,* 284 Or 361, 382, 587 P2d 994 (1978); *McKinzie et al. v. Cline et al.,* 197 Or 184, 195, 252 P2d 564 (1953). It is clear that the range of misconduct termed "inequitable" is quite broad, varying from the most egregious and concrete, such as fraud, to more amorphous and somewhat less egregious misconduct, sometimes described as "overreaching" or "sharp practice." *See Webb v. Culver,* 265 Or 467, 470, 509 P2d 1173 (1973) (referring to "fraud or other inequitable conduct"); *Moyer et ux v. Ramseyer et al,* 226 Or 122, 130, 359 P2d 407 (1961) (referring to "overreaching or lying in wait"); *Feero et al v. Housley et al,* 205 Or 404, 413, 288 P2d 1052 (1955) (treating overreaching and sharp business practices as inequitable conduct). In light of the breadth of that range, we discern no meaningful distinction between the adjectives "unconscionable" and "inequitable" for the purpose of determining whether the second requirement for reformation based on unilateral mistake has been satisfied.

Defendants' argument that they did not behave inequitably is premised in part on their disagreement with two of the trial court's findings of fact: (1) that plaintiffs'

attorney called defendants' attorney and objected to the revision of the deed; and (2) that defendants' attorney nonetheless persisted in making the change without further communicating with plaintiffs' attorney or providing him a copy of the revised deed. The trial court made the foregoing findings after considering the conflicting testimony of the attorneys. Because the trial court was in a better position to make the necessary credibility determinations, we will not disturb those findings on appeal. *See Jensen*, 280 Or at 227. The more difficult question is how much weight those findings carry in deciding whether defendants' conduct was inequitable. Defendants' attorney's conduct was not so egregious as to amount to fraud; despite plaintiffs' objection, he never agreed to abandon the revision. In one sense, he merely asserted a legal position that we have determined was incorrect. However, in view of plaintiffs' attorney's vehement objection to the revision, defendants' attorney's failure to remove it or, alternatively, to notify plaintiffs' attorney that it remained in the final deed form at closing, was a sharp practice sufficient to constitute inequitable conduct. *See Feero*, 205 Or at 413. Because the evidence established that defendants engaged in inequitable conduct, albeit not of the most egregious rank, plaintiffs satisfied the second element required for reformation based on unilateral mistake.

■■ We turn to defendants' argument that plaintiffs did not prove the third and final element required for reformation: a lack of gross negligence on their part. Plaintiffs bear the burden of proving by clear and convincing evidence that they were *not* grossly negligent. *Foster*, 177 Or App at 54. Plaintiffs posit two rationales for their position that they were not grossly negligent. First, they argue that their attorney "justifiably assumed that [defendants' attorney] would not modify the deed over his objection, and then not advise him or the court that he had done it." Second, they contend that Murray was not grossly negligent in failing to read the deed at closing, because "[h]e could reasonably assume that the deed conformed to [the agreement] and all of the documents prepared and reviewed by the attorney were in order."

■ In *Foster*, we discussed the test for determining the existence of gross negligence that will defeat a claim for equitable relief based on mistake:

"The term 'gross negligence,' at least as it is used in the reformation context, is not well defined in the case law. Certainly, not all inattentive conduct by a party seeking reformation will bar equitable relief. Rather, conduct, in order to bar reformation, must go beyond mere oversight, inadvertence, or mistake and, instead, must amount to a degree of inattention that is inexcusable under the circumstance. * * * '[G]ross negligence,' far from being a static concept subject to mechanical application, is one that requires careful consideration of the facts to determine if the party seeking reformation is, both in light of his or her own actions and as a matter of equity, entitled to such relief." 177 Or App at 54.

Although the inquiry necessarily is fact-specific,

"in the context of mistakes of fact, a party is grossly negligent if it fails to obtain information 'readily available' to it. *Walcutt*[, 109 Or App at 152]. Thus, a party must 'take reasonable measures to inform' itself. *Id.* In *Rosboro Lumber Co. v. Apsel*, 144 Or App 298, 926 P2d 329 (1996), *adhered to on recons* 146 Or App 333, 932 P2d 110 (1997), *rev den* 326 Or 530 (1998), we elaborated on that standard. There, we assessed 'whether it would be unreasonably difficult *under the circumstances* for the party * * * to perform an independent investigation.' *Id.* at 303-04 (emphasis added). In that case, there was 'a complete absence of evidence that it would have been unreasonably difficult for [the parties] to conduct an investigation[.]' *Id.* at 304." *Mariah Investments, Ltd. v. McCabe*, 163 Or App 91, 105, 986 P2d 1209 (1999), *rev den* 329 Or 651 (2000) (Wollheim, J., concurring) (emphasis in original).

In *Mariah Investments*, an equally divided court affirmed a judgment rescinding a written agreement to sell Oregon real property for a price substantially below its market value. At the time she executed the agreement, the plaintiff, an Alaska resident, erroneously believed that the county had completed a tax foreclosure on the property and that she had lost title to it. Unknown to the plaintiff at that time, another party had—in the hope of later acquiring the property from the plaintiff—redeemed the property from foreclosure.

On appeal, the primary issue was whether the plaintiff was grossly negligent in failing to determine that she still

held title to the property. The concurrence[7] concluded that, when she agreed to sell her interest in the property, relevant information regarding the property's true value was not "readily available" to the plaintiff:

> "Because I read the record to show that [the defendant's] offer to buy was open only through the evening of April 19, I consider [the plaintiff's] options for investigation during that evening in assessing whether information about the tax status of her property was 'readily available.' First, [the plaintiff] justifiably assumed that her property had been foreclosed by the county. Due to this foreclosure and the timing of [the co-plaintiff's] redemption, no current tax notices would have been sent to the property, [the plaintiff], or her mother until October 1995, signifying her continued ownership. Second, even had [the plaintiff] known whom to call in Oregon about foreclosure or taxes, she would have not been able to reach anyone to inquire about the taxes because it was after 6:00 p.m. in Oregon. Additionally, even had [the plaintiff] spoken with her mother, her mother did not possess any information to correct her misapprehension about the taxes. Finally, even had [the plaintiff] attempted to acquire the services of an attorney, it is questionable, as [the defendant] noted, whether she would have been able to reach an attorney after 5:00 p.m. and whether that attorney would have been able to correct the misconceptions [the plaintiff] harbored regarding the back property taxes. Therefore, I cannot say that [the plaintiff] was grossly negligent in failing to undertake an independent investigation that, *under the circumstances,* was unlikely to correct her mistake of fact concerning the tax status of her property." *Id.* at 105-06 (Wollheim, J., concurring) (emphasis in original).

With the foregoing principles in mind, we return to the facts at hand. At the outset we note that plaintiffs are responsible for their own acts, as well as those of their attorney. *Restatement (Second) of Agency* § 250 (1958). In his December 1992 letter, defendants' attorney advised plaintiffs' attorney that he was "inserting" the revised language into the deed. Plaintiffs' attorney recognized that the change would adversely affect his clients' rights under the parties'

---

[7] Although it lacks precedential value, we find the discussion in the concurrence to be helpful.

agreement. Although plaintiffs' attorney called defendants' attorney to protest the revision, there is no evidence that the latter acquiesced in, and agreed not to make, the change. According to plaintiffs' attorney, defendants' attorney stated only that "he wasn't sure [Laugsand] would sign the agreement or sign the deed if it didn't have that language in it." Even though plaintiffs' attorney emphatically responded that the change was not acceptable to plaintiffs, defendants' attorney's comment was a cue for plaintiffs' attorney to follow up the conversation by verifying whether defendants ultimately would agree to execute the original form of the deed without the revision. Although plaintiffs' attorney notified Murray about the proposed change, he did not document plaintiffs' objection or communicate further with defendants' attorney about the revision.

Further, although the deed was an important part of the transaction from plaintiffs' perspective, their attorney did not insist on receiving and reviewing a copy of its final form. Nor did he attend the closing or caution Murray to carefully inspect the deed—a two-page document—at the closing before it was recorded. An inspection especially was counseled here, where defendants' attorney previously had advised plaintiffs' attorney that the revision was being made and—despite the objection from plaintiffs' attorney—had not agreed to revert to the original form. At closing, Murray received a copy of the deed with the objectionable revision included in it. Murray did not review the deed to verify that the parties' disagreement had been resolved consistently with his position. Such a review would have taken no more than a few minutes and readily would have disclosed the offending revision.

Unlike in *Mariah Investments*, here the pertinent information was at Murray's fingertips—literally—at the closing. No phone calls or outside research was necessary; all Murray had to do was read the deed. There is no evidence that Murray acted under time pressure at closing or that it would have been "unreasonably difficult" for him to discover that the deed had been changed. In short, all information necessary to avoid the mistake was readily available to plaintiffs at closing with no need for an independent investigation.

In addition, after closing plaintiffs compounded their negligence by conveying the same timber rights—using identical language—to their related company.

■ We recognize that a party's failure to read a document, by itself, will generally not constitute gross negligence sufficient to bar reformation. *See Foster*, 177 Or App at 55; *but see Main*, 52 Or App at 804 (denying reformation because, among other reasons, the plaintiff was grossly negligent in failing to read relevant transaction documents). Typically, however, in cases where equitable relief has been upheld despite the plaintiff's failure to detect objectionable content in a legal document, either both parties were mistaken about what boiled down to a scrivener's error, *see, e.g., Kontz*, 167 Or at 206-07; *Wolfgang v. Henry Thiele Catering Co.*, 128 Or 433, 447-49, 275 P 33 (1929), or the defendant engaged in fraudulent or similarly reprehensible conduct. *See Peluck v. Pac. Machine & Blacksmith Co.*, 134 Or 171, 178-79, 293 P 417 (1930) (holding that the plaintiff's failure to read an instrument was excused by the defendant's fraud). That is not the case here. Only plaintiffs were mistaken about the contents of the deed, and Laugsand's conduct, although inequitable, was not so egregious as to excuse plaintiffs' level of inattention. Accordingly, the trial court erred in reforming the deed. Because the trial court's award of attorney fees to plaintiffs was premised on their successful reformation claim, we reverse on defendants' appeal from the supplemental attorney fee judgment.

Reversed and remanded on appeal; affirmed on cross-appeal.